UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

TAMMY BUNCE,

                              Plaintiff,

            v.

NEW YORK POWER AUTHORITY and
STEVEN COLAN,

                              Defendants.

**REPORT AND
RECOMMENDATION**

13-CV-57A

## I.  INTRODUCTION

The Hon. Richard J. Arcara referred this case to this Court under 28

U.S.C. § 636.  (Dkt. No. 8.)  Pending before the Court is a motion (Dkt. No. 26)

for summary judgment by defendants the New York Power Authority (the

"Authority") and Steven Colan ("Colan").  Plaintiff Tammy Bunce ("Bunce") has

alleged numerous instances of discrimination, retaliation, and other deprivations

of her rights, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. §§ 2000e to 2000e-17; the Family and Medical Leave Act ("FMLA"),

Pub.L. 103–3 (Feb. 5, 1993), 107 Stat. 6, codified in scattered sections of 5 and

29 U.S.C.; state civil-service laws; and the Fourteenth Amendment.  Defendants

want any allegations predating 2011 dismissed as untimely based on when

Bunce filed a formal complaint with the New York State Division of Human Rights

("NYSDHR").  Defendants want the more recent allegations dismissed because

they allege no more than ordinary workplace management and discipline that left

Bunce employed to this day at the Authority with the same salary and benefits.

Bunce responds by repeating the allegations in her complaint, supporting them

with her deposition testimony, and arguing that summary judgment cannot

resolve any questions about witness credibility.

The Court has deemed the motion submitted on papers under Rule 78(b)

of the Federal Rules of Civil Procedure ("FRCP").  For the reasons below, the

Court respectfully recommends granting the motion.

## II. BACKGROUND

This case concerns allegations that Bunce suffered repeated harassment,

retaliation, and micromanagement when she didn't play along with sexually

suggestive behavior from her supervisor.  Bunce joined the Authority in 1981 as

a Security Guard.  When Bunce joined the Authority, she also joined the

International Brotherhood of Electrical Workers ("IBEW") and the collective

bargaining agreement that the union had with the Authority.  The Authority did

not have a civil-service system in place and was not subject to New York's Civil

Service Law.  Around 1986, Bunce bid for and received the position of

Messenger/Driver.  As Messenger/Driver, Bunce carried mail between the post

office and the Authority's various facilities in Western New York.  Bunce also

would transport personnel and visitors to the Authority when asked.  With the

exception of short stints that she sought in other positions, Bunce worked as the

Messenger/Driver continuously until 2011.  The record is not clear as to who

2

supervised Bunce between 1981 and 2006, but the parties have not raised any issues regarding that time.  Bunce's employment between 1981 and 2006 appears to have been largely uneventful, at least with respect to any incidents similar to the incidents alleged in this case.

The events that gave rise to this case began around 2006 and, in Bunce's view, coincided with the assignment of Frank Giancola ("Giancola") as Bunce's supervisor.  According to Bunce, Giancola propositioned her for sex beginning in 2006.  When Bunce refused the proposition, Giancola allegedly began a pattern of hostile and micromanaging behavior as retaliation.  Giancola's alleged behavior included following Bunce around closely during the day, surveilling her from hidden places, and photographing her.  Other behavior consisted of increased disciplinary action that prompted Bunce, in turn, to file a number of union grievances.  Bunce filed 10 union grievances in 2008 alone.  Bunce complained to Colan but did not receive any satisfactory results.  Bunce also complained to Donna Robinson ("Robinson"), a Human Resources supervisor at the Authority's headquarters in White Plains, New York.  Robinson began an investigation, but Bunce withdrew her complaint when told in February 2009 that Giancola was retiring.  According to Bunce, the retirement was illusory—Giancola returned almost immediately on a temporary basis to his same position. Giancola ostensibly returned only to train his successor, but the return meant technically that he was Bunce's supervisor again.  The record is unclear as to

whether any incidents between Bunce and Giancola occurred between February 2009 and late 2009, when Giancola finally left.

Even after Giancola left, Bunce experienced a number of incidents that she believes constituted a continued hostile work environment against her. One incident involved the distribution of paychecks. On or around July 20, 2011, the Authority printed paychecks for distribution and placed them in a sealed envelope marked "Confidential." (Dkt. No. 26-23.) The envelope was addressed to someone other than Bunce. The use of a confidential envelope appears to have represented a change from prior practice. That day, Bunce opened the envelope and distributed paychecks to the intended recipients. The Authority objected immediately and began disciplinary proceedings, on the basis that Bunce had no reason to open a confidential envelope addressed to someone else. Bunce alternately has maintained 1) that no confidential envelope existed (*see* Dkt. No. 26-25 at 72 ("I do my job the way I've done it for the last 26 years."); *id.* ("We haven't established that the envelope really did say confidential.") (attorney objection)); 2) that she opened any envelope at the request of two supervisors (*see id.* at 76); or 3) that she did open a confidential envelope without hesitation because "[t]hose are paychecks. I'm responsible for them. I have been for 27 years." (Dkt. No. 26-19 at 3.) The Authority held a fact-finding hearing and

4

proceeded to discipline her around July and October 2011.[1]  The Authority

notified Bunce of its disciplinary action by letter.  (Dkt. No. 26-22.)  The discipline

consisted of a three-day suspension and a removal from the Messenger/Driver

position.  The Authority switched Bunce to a General Clerk position at a

warehouse because "[t]hese positions [of Messenger/Driver and Security Guard]

require a high level of trust and confidentiality from those who occupy these

positions, and you have demonstrated you are not trustworthy."  (*Id.* at 2.)  The

disciplinary letter also contained the following temporary restriction on other job

placements:

> You will not be able to bid out of the General Clerk position for a
> period of three (3) years from the date of this disciplinary
> memo, however, you will be permitted to volunteer for the Deck Hand
> position and receive the Deck Hand pay rate when such an
> assignment is made.  After the three year period has elapsed you
> may bid on any position you may be qualified for, with the exception
> of Messenger-Driver and Security as noted in (3) above.

(*Id.*)  Bunce alleges that the Authority labeled her as untrustworthy without

justification while a male employee committing a similar offense received a less

severe punishment.

Another incident between Bunce and the Authority involved the use of

leave time in late summer 2011.  The parties cannot agree to any details about

how the leave began.  Bunce maintains that on July 28, 2011, stress from

continued harassment caused symptoms consistent with either a panic attack or

---

[1] As explained below, a period of leave that Bunce took interrupted the implementation of the
discipline.

an acute depressive episode.  Bunce asked for permission to stop working and to go see someone in Occupational Health.  Bunce's request allegedly prompted Colan to deny the request, to survey her at home in the coming weeks, and to try to obtain private information from her psychologist.  In the Authority's version, Bunce started calling in sick around July 27, 2011.  The parties corresponded about Bunce's need to submit FMLA documentation for an extended absence.  Bunce did not provide FMLA certification until August 30, 2011.  Although the parties disagree sharply about the setup of Bunce's leave, they do not appear to dispute that Bunce eventually set up a leave period successfully and returned to work on October 5, 2011.

Bunce remains employed at the Authority as a General Clerk, with the same pay and benefits that she had as a Messenger/Driver.

Bunce's employment history at the Authority includes a sexual relationship that predated her complaints about Giancola.  Bunce has asserted that coworker Daniel Elmer ("Elmer") made repeated comments about trying to date her around 2002.  Bunce and Elmer later entered a sexual relationship that ended after a few years.  Elmer has admitted to a sexual encounter in 2002 and in 2003.  Elmer's exact work relationship to Bunce at the time is not clear, though Elmer appears to have had some supervisory authority over Bunce around the time of the sealed envelope and paycheck incident.  Elmer attended the fact-finding hearing concerning the confidential envelope.

6

Bunce began formal administrative proceedings about a month after losing the Messenger/Driver position.  Bunce filed a complaint with the NYSDHR on November 8, 2011; the agency stamped it received on November 10, 2011. (Dkt. No. 26-4 at 4.)  Bunce indicated in the complaint that the Authority discriminated against her based on age and sex.  The complaint contains 136 paragraphs alleging discriminatory conduct dating back to 2003.  The alleged discriminatory conduct listed in the complaint included preferential treatment for men working at the Authority; sexually suggestive comments from Giancola; pressure for a sexual relationship from Elmer; lost opportunities for overtime or other job placements; and numerous instances of unduly harsh or micromanaging behavior from Giancola and Colan that stemmed from discriminatory motives.

The Authority responded to Bunce's complaint on December 22, 2011. (Dkt. No. 26-5.)  For each overtime opportunity or job placement allegedly lost, the Authority gave an explanation grounded in the collective bargaining agreement.  The Authority asserted that most of Bunce's allegations of unlawful harassment constituted discrete instances of discipline for poor performance; the Authority simply denied the more severe allegations as unfounded.  In a decision dated May 7, 2012, the NYSDHR found no probable cause to believe that the Authority discriminated against Bunce.  (Dkt. No. 26-6 at 2.)  The NYSDHR's principal paragraph is copied here in its entirety:

7

Allegations 3-76 were not be address [sic][2] as they date back more than one year prior to the filing of the Charge and are barred by the statute of limitations.  The record shows Complainant grieved the allegation regarding overtime on the Ice Breaking Crew and the issue was resolved, there is no record Complainant appealed the outcome of the grievance process.  The record shows the controlling factor for purposes of overtime related to the snow shoveling was job classification, not age or sex.  There is no evidence to show Complainant was qualified for the Job Flexibility Agreement as it did not apply to the Messenger/Driver position, regardless of what employee occupied that position.  There is no evidence to show Complainant was told her employment was day to day; once Respondent found a permanent job for Complainant she was placed in it.  Respondent and the union have policies and procedures in place regarding the issuance of discipline, regardless of an employees [sic] sex or age.  There is no nexus between Complainant's sex and age and her temporary assignment to the Warehouse based on her actions of opening mail, not addressed to her, marked "confidential."

(*Id.*)  In a Notice of Rights letter dated October 18, 2012, the Equal Employment Opportunity Commission ("EEOC") adopted the NYSDHR findings and closed its file.

Bunce commenced this case by filing her complaint against the Authority and Colan on January 16, 2013.  (Dkt. No. 1.)  The complaint contained six claims.  In the first claim, Bunce accused defendants of a hostile work environment in violation of Title VII.  Bunce asserted that defendants, through supervisors, committed the following acts between 2006 and 2011 to create a hostile work environment:

a. Demanded that she have sex with him;

---

[2] Probably "will not be addressed."

b. Followed her;

c. Stared at her body;

d. Followed her to the ladies' restroom and timed how long she took;

e. Physically threatened her, causing her to fall and hit her head;

f. Screamed at her in front of co-workers;

g. Wrote her up on specious disciplinary charges;

h. Called a visiting employee's hotel room in the early morning to ask if she was there with him;

i. Hid in the bushes at work to watch her;

j. Took photos of her with his personal cell phone;

k. Demanded that she disclose personal, medical information about herself to him;

l. Made her attend specious disciplinary hearings;

m. Disciplined her for getting a flat tire;

n. Disciplined her for losing cell phone reception;

o. Threatened her with termination;

p. Accused her of fictitious work infractions;

q. Ordered her, and her alone, to call Frank Giancola at home for any work-related issues, contrary to Defendant's policy;

r. Ransacked her desk;

s. Re-hired Frank Giancola and assigned him to supervise her, after it was decided he was harassing her;

t. Denied her overtime work, in favor of an unqualified male;

u. Accused her of opening confidential mail, without producing the envelope at issue, and despite having been instructed by at least one supervisor to do so;

v. Suspended her without a hearing and without evidence;

w. Stripped her of her job duties;

x. Declared her "not trustworthy" and published that statement to other employees;

y. Accused her of losing the cell phone and pager she turned in to them;

z. Unexpectedly assigned her to work in the warehouse and then immediately chastised her for not being dressed to work in the warehouse;

aa. Refused to pay her the proper rate for warehouse work;

bb. Demoted her work status to day-to-day;

cc. Watched her while she was at home;

dd. Refused to let her go to Defendant's Occupational Health Department;

ee. Called her therapist to try to get information about her therapy sessions;

ff. Deleted the log of her sick calls;

gg. Suspended her a second time, three months later, for the same infraction she had already been suspended for;

hh. Took her keys but refused to provide her with a receipt;

ii. Opened her confidential FMLA medical documents;

jj. Refused to train her for the work she was assigned;

kk. Refused to pay her the proper rate for the work she was assigned; [and]

ll. Barred her from applying for a new position for three years, in violation of her contract.

(Dkt. No. 1 at 13–15 ¶ 111.)  In the second claim, Bunce accused defendants of

retaliation in violation of Title VII and asserted the following examples of

retaliation:

    a. She reported Frank Giancola's harassment to HR Director Colan. HR Director Colan declined to act.

    b. She reported Frank Giancola's violent attack to HR Director Colan.  HR Director Colan declined to act.

    c. She reported on October 17, 2008 to Frank Giancola and HR Director Colan, with her Union Representative, that Frank Giancola was harassing her and everyone in the department saw it.  HR Director Colan declined to act.  Frank Giancola escalated his behavior, calling the visiting employee's hotel room, hiding in bushes to watch her, photographed her, demanded personal, medical information from her and threatened to dock her pay if she refused.

    d. She reported to Defendant's Human Resources Department at its corporate headquarter[s], on November 14 and 19, 2008 that HR Director Colan refused to stop Frank Giancola's harassment.  HR Director Colan responded by calling a meeting with her to discuss her reports of harassment. However, he did not discuss her concerns, but disciplined her for the third time for getting a flat tire sometime in the past. HR Director Colan then threatened her with termination. Frank Giancola continued to follow her.  HR Director Colan and Frank Giancola then told her, contrary to Defendant's policy, that she and she alone had to call Frank Giancola at home for anything work-related.

    e. She reported to Defendant's Corporate Human Resources that HR Director Colan and Frank Giancola were retaliating against her. Subsequently, HR Director Colan called her to a meeting to reiterate that she had to call Frank Giancola at home. Frank Giancola disciplined her for losing cell phone reception.

    f. In February 2009, she reported in person to Defendant's Corporate HR that she was still being discriminated and retaliated against.  Defendant forced Frank Giancola to retire, upon information and belief, but Defendant then immediately

re-hired Frank Giancola and assigned him to supervise her, without Corporate HR's permission. Frank Giancola disciplined her again for losing cell phone reception.

g. In March 2009, she again reported to Defendant's Corporate HR that she was still being discriminated and retaliated against. Though Defendant transferred her away from Frank Giancola, she remained under the authority of HR Director Colan.  He continued to discipline her for specious infractions, ultimately suspending her twice for the same alleged infraction, permanently demoting her, and demoting her work status to day-to-day.

(*Id.* at 15–16 ¶ 115.)  In the third claim, Bunce accused defendants of retaliation in violation of the FMLA.  Specifically, Bunce accused Colan of committing the following acts when she returned from her leave in October 2011: ordering her to report to his office instead of Occupational Health; refusing to allow her to use the ladies' room; deleting calls out of her sick call-in logs; writing her a disciplinary letter that stated that her discipline would be extended if she took any kind of medical leave; and opening her confidential medical FMLA documents.  In the fourth claim, Bunce accused defendants of violating Section 75 of the New York Civil Service Law by not giving her written notice and a copy of her October 2011 disciplinary charges.  In the fifth claim, Bunce accused Colan of an unlawful seizure of her property rights under her employment contract, in violation of the Fourth Amendment.  In the sixth claim, Bunce accused defendants of depriving her of her Fourteenth Amendment liberty interest by subjecting her to stigmatizing disciplinary action.

12

Defendants filed the pending motion on December 23, 2014.  Defendants argue that the allegation of a hostile work environment fails because many of the allegations are time-barred; many of the remaining allegations concern workplace civility and have nothing to do with Bunce's sex; and the few allegations that directly implicate Bunce's sex are supported by nothing more than Bunce's own self-serving statements.  Similarly, defendants attack the Title VII claim by arguing that Bunce's job never changed except in response to her own workplace misconduct and that her complaints in 2008 did not implicate Title VII.  Bunce's FMLA retaliation claim falls short, according to defendants, because her allegations at most indicate bureaucratic inconveniences and not adverse employment actions.  Defendants seek dismissal of the Civil Service Law claim on the basis that the Authority is not subject to New York civil-service rules.  As for Bunce's constitutional claims, defendants argue that Colan as an individual should receive qualified immunity; that Bunce had the right to union representation at all disciplinary proceedings; and that Bunce cannot claim deprivation of a liberty interest because the Authority still employs her at the same pay as she had before her October 2011 transfer from the Messenger/Driver position.

Bunce opposes defendants' motion in all but one respect.  Bunce agrees that hourly employees of the Authority are not subject to the New York Civil Service Law and has withdrawn the fourth claim from her complaint.  Bunce

rebuts all of defendants' other points largely by repeating the allegations from her complaint, including repeating almost verbatim the two lists of allegations that the Court reprinted above. Bunce buttresses her allegations with references to her own deposition transcript.

## III. DISCUSSION

### A. Summary Judgment Generally

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence in the record that could reasonably

14

support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

Bunce's reliance on her own allegations and her own deposition transcript to defeat the motion brings an additional general principle into play. "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999) (citations omitted). "A plaintiff's self-serving statement, without direct or circumstantial evidence to support the [Title VII] charge, is also insufficient." *Risco v. McHugh*, 868 F. Supp. 2d 75, 99 (S.D.N.Y. 2012) (citations omitted). Nonetheless, if Bunce makes certain factual assertions that defendants deny, or vice versa, and if the assertions do not lend themselves to documentary evidence, then a jury assessment of credibility might be the only option. *Cf., e.g., Lafferty v. Owens, Schine & Nicola, P.C.*, No. 3:09CV1045 MRK, 2012 WL 162332, at *1 (D. Conn. Jan. 18, 2012) ("Ms. Lafferty's discrimination and retaliation claims against OSN are based on he-said-she-said disputes that require the kind of credibility assessment best suited to a jury.").

### B. Timeliness of Bunce's Allegations

As a preliminary matter, the Court will assess defendants' argument that some or all of Bunce's Title VII claims are untimely. New complaints about employer conduct prohibited by Title VII must be filed within 180 days if brought

to the EEOC, or 300 days if brought first to the NYSDHR.  *See* 42 U.S.C.

§ 2000e-5(e)(1) (requiring that charges of Title VII unlawful employment practices

be filed with the EEOC within 180 days, or 300 days if first brought to an

analogous state agency); *Yoonessi v. State Univ. of N.Y.*, 862 F. Supp. 1005,

1013 (W.D.N.Y. 1994) (Arcara, *J.*) ("In a state such as New York with a state

anti-discrimination agency, the complainant has 300 days to file a complaint with

the EEOC or NYSDHR.  Absent a legitimate waiver, estoppel, or equitable tolling,

failure to file an agency charge within the applicable time period precludes a

plaintiff from bringing a Title VII suit in federal court.")  (citations omitted).  Title

VII complainants must follow the statutory filing requirements, or else "a plaintiff

would be able at his or her choosing to circumvent the Congressionally-created

administrative scheme designed to facilitate voluntary compliance with or to

settle disputes falling under Title VII.  Courts within this circuit which have

considered the issue are reluctant to hear claims that were not originally filed with

the EEOC for these reasons."  *Moche v. City Univ. of N.Y.*, 781 F. Supp. 160,

167 (E.D.N.Y. 1992) (internal quotation marks and citations omitted).

The above principles apply most easily to discrete acts of discrimination or

retaliation but apply a little differently to allegations of a hostile work environment.

"Hostile environment claims are different in kind from discrete acts. Their very

nature involves repeated conduct.  The 'unlawful employment practice' therefore

cannot be said to occur on any particular day.  It occurs over a series of days or

16

perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *AMTRAK v. Morgan*, 536 U.S. 101, 115 (2002) (citations omitted). "Given, therefore, that the incidents comprising a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." *Id.* at 118; *accord McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 76 (2d Cir. 2010) ("Accordingly, if any act falls within the statutory time period, we need to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice.") (internal quotation marks and citation omitted).

All of the above principles give the Court guidance as to what time frame to apply to Bunce's allegations. Bunce filed her NYSDHR complaint on November 10, 2011, based on what appears to be the stamping on the first page indicating receipt by the agency. Looking back 300 days from the date of receipt yields a date of January 14, 2011. *Cf. McGullam*, 609 F.3d at 76 (making the same calculation). For Bunce's Title VII claim for a hostile work environment, at least one act contributing to a hostile work environment must have occurred on or after January 14, 2011. For Bunce's Title VII claim for retaliation, the Court will consider each allegedly retaliatory act that occurred on or after the same date.

### C. Title VII Hostile Work Environment

The Court now moves to the substance of Bunce's claim of a hostile work environment.  "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1) (Westlaw 2015).  "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment . . . . For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66–67 (1986) (internal brackets, quotation marks, and citations omitted).  "A hostile work environment claim requires a showing [1] that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and [2] that a specific basis exists for imputing the objectionable conduct to the employer."  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks and citations omitted).  The pervasiveness requirement is particularly important.  By the very use of the term "environment," this Title VII theory requires a workplace situation that is transformative or persists over time.  *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—

an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview."). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." *Id.* at 23. "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness. But it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano*, 294 F.3d at 374 (citations omitted).

In reviewing the record and Bunce's original NYSDHR complaint—which contains a well-organized chronology and description of alleged events—the Court notices two intertwined factors that pose a problem for Bunce's claim. First, none of the allegations dated 2011 and later concern Bunce's sex and thus do not implicate Title VII. "It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title

19

VII only when it occurs because of an employee's sex, or other protected characteristic." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (citation omitted). Second, and related to the first factor, everything alleged to have happened since 2011 concerns workplace discipline or collectively bargained job responsibilities. The allegations concerning job flexibility involved interpretations of the collective bargaining agreement between the Authority and Bunce's union (Dkt. No. 26-5 at 33); Bunce filed at least one grievance (Dkt. No. 26-5 at 19) that did not mention sex and that appears to have been resolved. Regarding distribution of paychecks, there may or may not have been a custom and practice in place; and it may or may not have changed; and Bunce may or may not have ignored any changes. In any event, whether paychecks had been sealed in a confidential envelope and who was supposed to open that envelope has nothing to do with Bunce's sex. "These actions, considered in their totality, paint a picture of a challenging working environment where Plaintiff was subject to rigid forms of discipline, but, assessing the severity, frequency, and degree of Defendants' alleged abuse, the Court does not find that they created a workplace so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of Plaintiff's employment were thereby altered." *Batchelor v. City of New York*, 12 F. Supp. 3d 458, 479 (E.D.N.Y. 2014) (editorial and internal quotation marks and citation omitted). Bunce refers to a woman security guard who received unfairly light discipline and to "younger, well-

20

connected daughters of former and current elected union officials [who] are

receiving the much higher rate of pay and only performing clerk duties." (Dkt.

No. 26-4 at 17–18.)  If the Authority had been giving preferential treatment to

certain women employees then that treatment would appear to undermine any

suggestion that the Authority is targeting Bunce based on sex.  Bunce's

grievances about transport of personnel (*e.g.*, Dkt. No. 26-4 at 61, 63) implicate

the collective bargaining agreement and say nothing about her sex.  The alleged

incidents involving the visit to Occupational Health, the request for medical

documents, the use of personal versus Authority vehicles, and the reassignment

to a General Clerk position (*see generally* Dkt. No. 26-4 at 19–33) at most reveal

ham-fisted, rigid, or perhaps even pedantic personnel management.  *Cf. Demoret

v. Zegarelli*, 451 F.3d 140, 150 (2d Cir. 2006) ("There is little, if any, evidence to

suggest that Douglas's close monitoring of Demoret's work, his mild rudeness to

her, or his failure to take advantage of all of her abilities was motivated by gender

discrimination.  Likewise, there is little evidence that the Administrator was

discriminating against Demoret on account of her sex when he assigned

responsibilities formerly handled by her, such as maintaining custody of the

mayoral stamp, to other female employees.  Further, this treatment was not so

severe as to be abusive."); *Janneh v. Endvest, Inc.*, 64 F. App'x 814, 816 (2d Cir.

2003) (summary order) (affirming summary judgment and finding no hostile work

environment based only on a supervisor who was "impolite, sarcastic,

21

antagonistic, and totally rude"). Even then, however, Bunce's descriptions of such bad management have nothing to do with her sex.

Without at least one alleged act in 2011 or later that implicated Bunce's sex and that contributed to a hostile work environment based on sex, Bunce's claim cannot go any farther. The Court thus recommends granting defendants' motion as to the first claim in Bunce's complaint.

### D. Title VII Retaliation

The Court next turns to the second claim in the complaint, Bunce's claim for Title VII retaliation. "To state a claim for retaliation, a plaintiff must establish: (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff or action that would dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) a causal connection between the protected activity and adverse action. Should the plaintiff state a claim for retaliation, the defendant may then articulate a nondiscriminatory, legitimate reason for taking the action complained of, and then the burden shifts to the plaintiff to show that the employer's articulated reason is both untrue and a pretext for the true retaliatory motive." *Rodas v. Town of Farmington*, 918 F. Supp. 2d 183, 188–89 (W.D.N.Y. 2013) (Telesca, *J.*), *aff'd*, 567 F. App'x 24 (2d Cir. 2014). "To establish the first of these elements— participation in a protected activity—[Bunce] need not prove that the conditions against which [she] protested actually amounted to a violation of Title VII.

22

Rather, [Bunce] must demonstrate only that [she] had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999) (internal quotation marks and citations omitted). "A protected activity does not have to rise to the level of a formal complaint and includes complaints to management, writing critical letters and expressing support for co-workers." *Kretzmon v. Erie Cnty.*, No. 11-CV-0704, 2013 WL 636545, at *5 (W.D.N.Y. Feb. 20, 2013) (Arcara, *J.*) (internal quotation marks and citation omitted).

Here, Bunce's claim for retaliation suffers the same defect as her claim for a hostile work environment—namely, that none of her allegations from 2011 forward implicate her sex. As noted above, Bunce's allegations in that year concern job flexibility, paycheck distribution, when and how she took medical leave, and job reassignment. All of the incidents concerned either the collective bargaining agreement between the Authority and the union or the application of specific workplace policies and practices. "Her own allegations, and the documents she relies on, show instead that while she did complain about certain problems she was having at work, she did not complain that she was being discriminated against on account of her sex." *Foster v. Humane Soc'y of Rochester & Monroe Cnty., Inc.*, 724 F. Supp. 2d 382, 395 (W.D.N.Y. 2010) (Larimer, *J.*) Bunce has not made a *prima facie* case to lead the Court to believe that other employees committing the same conduct and making the same

23

complaints would have been treated differently based on their sex. *Cf. Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 520 (S.D.N.Y. 2010) (dismissing a retaliation claim in part where plaintiff's "own characterization of his internal complaints, however, is entirely gender-neutral"). Bunce filed a number of grievances regarding these incidents, but the grievances did not require investigating discriminatory motive under Title VII. *Cf. Monroe v. Xerox Corp.*, 664 F. Supp. 2d 235, 246 (W.D.N.Y. 2009) (Siragusa, *J.*) (dismissing a complaint in part because "as already discussed above, the September 2005 complaint [about disparities in overtime] had nothing to do with sex discrimination or any other discrimination protected by Title VII"). Whatever the outcome of the grievances, no reasonable jury could conclude that the resolution of one grievance prompted the next incident and retaliation based on sex. To say otherwise would suggest that, in Bunce's view and to take just one example, the Authority changed its paycheck distribution practice without telling Bunce as sexually discriminatory payback for complaining about job flexibility. In the particular instance of her medical leave, the parties dispute sharply whether Bunce followed proper FMLA procedure initially but do not dispute that ultimately, Bunce successfully invoked the FMLA and returned to work on October 5, 2011. In the particular instance of her job reassignment in October 2011, Bunce does not dispute that her salary and benefits remained the same.

All told, nothing that Bunce has alleged for the year 2011 implicated her sex, no complaints that she filed in themselves sparked other incidents, and at the end of the year, Bunce remained employed at the Authority for the same salary and benefits.  Bunce's allegations thus do not suffice to sustain a retaliation claim under Title VII.  The Court thus recommends granting defendants' motion with respect to the second claim in the complaint.

### E.  FMLA Retaliation

Next, the Court will assess the third claim in the complaint, the claim for retaliation under the FMLA.  "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  "An employer may be liable for compensation and benefits lost by reason of the violation, for other actual monetary losses sustained as a direct result of the violation, and for appropriate equitable or other relief, including employment, reinstatement, promotion, or any other relief tailored to the harm suffered.  Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.  It would also include manipulation by a covered employer to avoid responsibilities under FMLA, for example: (1) Transferring employees from one worksite to another for the purpose of reducing worksites, or to keep worksites, below the 50–employee threshold for employee eligibility under the Act; (2) Changing the

essential functions of the job in order to preclude the taking of leave; (3)

Reducing hours available to work in order to avoid employee eligibility."  29

C.F.R. § 825.220(b) (citation omitted).  "[T]he retaliation analysis pursuant to

*McDonnell Douglas* is applicable.  [Bunce] appears to be alleging that [she] was

punished for exercising [her] rights under the FMLA.  In order to make out a

prima facie case, [she] must establish that: 1) [she] exercised rights protected

under the FMLA; 2) [she] was qualified for [her] position; 3) [she] suffered an

adverse employment action; and 4) the adverse employment action occurred

under circumstances giving rise to an inference of retaliatory intent."  *Potenza v.*

*City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).

Assuming *arguendo* that Bunce meets the first and second elements of a

*prima facie* case, she does not meet the third and fourth elements.  Regardless

of any dispute between the parties about setting up the paperwork necessary for

Bunce's leave, Bunce successfully took leave and returned to work on October 5,

2011.  Bunce remains employed at the Authority as a General Clerk, at the same

salary and benefits that she received when she was a Messenger/Driver.  The

Authority changed her title in the aftermath of the incident involving paychecks in

a confidential envelope.  Bunce apparently received notice of the change in title

by letter when she returned from leave.  (Dkt. No. 26-22 at 2.)  In her

memorandum of law, Bunce cites this letter as proof of the allegation in her

complaint that Colan "[w]rote her a disciplinary letter that stated if she took any

kind of medical leave, her discipline would be extended." (Dkt. No. 32 at 19.) Bunce's citation is disingenuous. The Authority may have delivered the letter when Bunce returned from leave, but the letter itself has nothing to do with leave. The letter cites the paycheck incident as the basis of a suspension. The closest that the letter comes to Bunce's allegation is in numbered paragraph five, which reads as follows: "The term of this disciplinary action shall be extended day-for-day by any periods of leave in excess of ten (10) consecutive working days, including, but not limited to, vacation, sick, medical, personal, jury duty or disability leave, or workers compensation." (Dkt. No. 26-22 at 2.) That sentence means only that Bunce could not run out her suspension by taking leave; the suspension would be put on hold if she took leave and would resume when she returned. Twisting that meaning into a threat that invoking leave would be punished is inexcusable. Bunce's remaining accusations of retaliation are buttressed only by her own deposition testimony; even if true, reporting to an office, directions about a bathroom, and accusations about paperwork do not come anywhere near the standard for an adverse employment action or for retaliatory intent.

Without some material change in Bunce's work conditions that indicates retaliatory intent, Bunce's claim fails. The Court accordingly recommends granting defendants' motion with respect to the third claim in the complaint.

### F.  New York Civil Service Law Section 75

The Court's mention of this fourth claim in the complaint is a formality just for the sake of completeness.  As mentioned above, Bunce has withdrawn the claim.  (Dkt. No. 32 at 20.)  The Court accordingly recommends granting defendants' motion with respect to the fourth claim.

### G. Fourth Amendment Unlawful Seizure

The Court's treatment of Bunce's fifth claim for unlawful seizure also will be brief but for a different reason.  "[T]he Fourth Amendment is the proper source of constitutional protection for claims, such as malicious prosecution, that implicate a person's liberty interest in respect of criminal prosecutions (and, in particular, one's pretrial liberty)."  *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 115 (2d Cir. 1995) (citation omitted); *see also Albright v. Oliver*, 510 U.S. 266, 274 (1994) ("We have in the past noted the Fourth Amendment's relevance to the deprivations of liberty that go hand in hand with criminal prosecutions.") (citation omitted).  "Accordingly, a plaintiff asserting such a claim must show some deprivation of liberty consistent with the concept of 'seizure.'"  *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010) (internal quotation marks omitted) (citing *Singer*, 63 F.3d at 116).  None of the allegations in Bunce's complaint implicate a criminal prosecution, a criminal restraint on pretrial liberty, or any sort of seizure contemplated by the Fourth Amendment.  To the extent that Bunce alleges due-process violations in violation of the Fourteenth Amendment, the Court

consolidates those allegations with the liberty-interest allegations and addresses
them below.  The Court otherwise recommends granting defendants' motion with
respect to the fifth claim in the complaint.

### H. Fourteenth Amendment Due Process and Liberty Interest

Finally, the Court will address Bunce's consolidated sixth claim from her
complaint, alleging deprivations of due process and liberty interests in violation of
the Fourteenth Amendment.  "The Due Process Clause of the Fourteenth
Amendment requires that, generally, a person must be afforded the opportunity
for a hearing prior to being deprived of a constitutionally protected liberty or
property interest."  *Patterson v. City of Utica*, 370 F.3d 322, 329 (2d Cir. 2004)
(citations omitted).  "In order for a person to establish that the state has deprived
him of property without due process, he must first identify a property right,
second show that the state has deprived him of *that* right, and third show that the
deprivation was effected without due process."  *Mehta v. Surles*, 905 F.2d 595,
598 (2d Cir. 1990) (citation omitted).  "To have a property interest in a benefit, a
person clearly must have more than an abstract need or desire for it.  He must
have more than a unilateral expectation of it.  He must, instead, have a legitimate
claim of entitlement to it.  It is a purpose of the ancient institution of property to
protect those claims upon which people rely in their daily lives, reliance that must
not be arbitrarily undermined.  It is a purpose of the constitutional right to a
hearing to provide an opportunity for a person to vindicate those claims.

Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).  "Pre-deprivation process need not be elaborate.  Its primary function is to serve as an initial check against mistaken decisions." *O'Connor v. Pierson*, 426 F.3d 187, 198 (2d Cir. 2005) (internal quotation marks and citations omitted).

Here, Bunce fails to establish any of the elements of a due-process violation.  Bunce's strongest claim to a violation concerns the incident involving the confidential envelope and the October 2011 discipline for it.  That discipline consisted of a transfer from the Messenger/Driver position to a General Clerk position.  Bunce has made no showing of an entitlement to the particular title of Messenger/Driver. *See  Barnes v. Pilgrim Psychiatric Ctr.*, 860 F. Supp. 2d 194, 204 (E.D.N.Y. 2012) ("[I]t has been held by courts in this district that employees who are reassigned to report to locations where they are prevented from performing their usual functions, while continuing to receive full salary and benefits, state no claim for deprivation of a Constitutionally protected right.") (citations omitted); *cf. Guida v. Police Dep't of City of New York*, No. 96 CIV. 0355 (JSM), 1997 WL 269508, at *2 (S.D.N.Y. May 20, 1997) (collecting cases

and noting, in a civil-service context, no right "either to a specific position with specific duties in a specific location, or to a promotion or to opportunities to earn overtime"). Bunce never was terminated or placed involuntarily on unpaid leave. In fact, Bunce continues to work at the Authority with the same salary and benefits that she had before October 2011. *Cf. Deal v. Seneca Cnty.*, No. 07-CV-6497, 2008 WL 2020004, at *4 (W.D.N.Y. May 8, 2008) (Telesca, *J.*) ("Here, plaintiffs allege a property interest relating to conditions of employment including denial of overtime and unfavorable work assignments. However, these allegations do not constitute protected property interests within the meaning of the Due Process Clause.") (citations omitted). As for process, Bunce participated in a fact-finding hearing in July 2011 accompanied by a union representative. Bunce received notice that the fact-finding hearing could lead to disciplinary action. Several times during the hearing, Bunce implicitly acknowledged doing exactly what the Authority accused her of doing and implicitly rejected the Authority's policies as illegitimate. The following exchange from the fact-finding hearing captures the tone of Bunce's testimony:

> 12SC: Who instructed you to hand deliver any paychecks?
>
> TB: I've done this for years, handing them their paychecks. Harry, Matt and whoever else is standing there.
>
> SC: Did you intentionally open the Confidential envelope this morning to remove checks?
>
> TB: Yes.

15SC: In the last fact-finder we had with you at the end of May, you told me you don't open intra-plant mail.  Now, you tell me you opened not only an intra-plant mail envelope, but a Confidential envelope.  Did you make a false statement in the last factfinder?

TB: No, I did not.

SC: Was this false statement intentional?

TB:[3]

14SC: When you are handling an envelope marked "confidential," what does that mean to you in terms of ensuring it is delivered unopened?

TB: Those are the paychecks.  I'm responsible for them.  I have been for 27 years.

SC: That does not answer my question, Tammy.

TB: I answered your question.

SC: I will ask you again, Tammy, when you are handling Confidential envelopes, what does that mean to you to in terms of delivery and security of them?

TB: [*long pause*] I answered the question.

(Dkt. No. 26-19 at 3.)

Putting aside that the above testimony contradicts Bunce's argument

denying the existence of a confidential envelope (*see* Dkt. No. 32 at 12 ("In this

case she was accused of opening an envelope marked confidential.  She denied

it being a confidential envelope and reported that the envelope she did have was

not marked 'confidential' and that she had opened it at the direction of

---

[3] No omission.  This line of the transcript is blank.

supervisory personnel."), the exchanges like the one above are important because they demonstrate that Bunce felt comfortable asserting her point of view when she had a chance to be heard.  The collective bargaining agreement between the Authority and the union provided Bunce further protections.  From numerous prior grievances, Bunce knew very well how to invoke those protections if she felt the need to do so.  The Court is reluctant to find a lack of due process under these circumstances.

Bunce's liberty-interest claim fares no better.  "A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983.  Instead, when dealing with loss of reputation alone, a state law defamation action for damages is the appropriate means of vindicating that loss.  Loss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment.  For a government employee, a cause of action under § 1983 for deprivation of a liberty interest without due process of law may arise when an alleged government defamation occurs in the course of dismissal from government employment.  This type of claim is commonly referred to as a 'stigma-plus' claim.  In order to fulfill the requirements of a stigma-plus claim arising from the termination from government employment, a plaintiff must first

show that the government made stigmatizing statements about him—statements that call into question plaintiff's good name, reputation, honor, or integrity. Statements that denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession may also fulfill this requirement.  A plaintiff generally is required only to raise the falsity of these stigmatizing statements as an issue, not prove they are false.  Second, a plaintiff must prove these stigmatizing statements were made public.  And third, plaintiff must show the stigmatizing statements were made concurrently in time to plaintiff's dismissal from government employment. If a plaintiff successfully proves his stigma-plus claim, due process requires that as a remedy he be given a post-deprivation opportunity to clear his name." *Patterson*, 370 F.3d at 329–30 (internal quotation marks and citations omitted). Here, Bunce remains employed at the Authority to this day.  Under the terms of the disciplinary action, Bunce could not bid on other jobs for three years, meaning that she was free to do so as of October 2014. *Cf. Roth*, 408 U.S. 564, 575 (1972) ("Hence, on the record before us, all that clearly appears is that the respondent was not rehired for one year at one university.  It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another.").  Bunce's ability to bid on other jobs within the Authority, let alone her ability to seek

34

employment elsewhere, hardly constitutes a significant roadblock in her career. The October 2011 disciplinary letter does label her as "not trustworthy," but given her testimony at the fact-finding hearing, that label appears mild given Bunce's apparent attitude that she could decide for herself what Authority policies applied to her.  As for any issue of publication related to Bunce's claim, the Court cannot ignore that the Authority intended the letter for Bunce alone.  Any further dissemination of the information in the letter came from Bunce herself.  *Cf. Couch v. Cate*, 379 F. App'x 560, 565 (9th Cir. 2010) (unpublished decision) ("Other than such self-reporting, Couch and Jimenez have pleaded no facts suggesting that the allegedly stigmatizing information has been or will be published."); *McMath v. City of Gary, Ind.*, 976 F.2d 1026, 1032–33 (7th Cir. 1992) ("Of course, only if the defendants *themselves* published the defamatory material can McMath recover for deprivation of his liberty interest . . . . Absent proof that the defendants disseminated the stigmatizing information beyond the appropriate chain of command within the City of Gary, McMath cannot succeed.") (citations omitted).  If the Authority had at least equivocated about whether it would make the disciplinary letter available to possible future employers then that might have sufficed to satisfy the publication requirement.  *See Brandt v. Bd. of Co-op. Educ. Servs.*, 820 F.2d 41, 44 (2d Cir. 1987) ("At the conference before Judge Wexler in November 1986, the Board did not stipulate that it would never disclose the charges to Brandt's prospective employers.  The Board's counsel

35

stated that he believed the Board's policy was to not disclose but Brandt vigorously contested this representation.  Thus, there was a genuine issue of fact regarding the likelihood of disclosure to Brandt's prospective employers.").  The record on its face, however, indicates that the Authority intended to keep the letter confidential.  No defamatory publication thus occurred.

In all, Bunce had protections under a collective bargaining agreement and used them when she saw fit.  The Authority gave Bunce a fact-finding hearing before imposing a discipline that left her employment status, salary, and benefits intact.  The three-year prohibition on bidding for other jobs already has passed. The disciplinary letter that announced the transfer of positions was confidential. Under these circumstances, no reasonable jury could find that the Authority violated Bunce's Fourteenth Amendment rights.  The Court thus recommends granting defendants' motion with respect to the sixth claim in the complaint.

## IV. CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting defendants' motion (Dkt. No. 26)  and dismissing Bunce's complaint in its entirety.

## V.  OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14

days.  *See* 28 U.S.C. § 636(b)(1); FRCP 72.  "As a rule, a party's failure to object

to any purported error or omission in a magistrate judge's report waives further

judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003)

(citations omitted).

      SO ORDERED.

                                   /s/ Hugh B. Scott

                                HONORABLE HUGH B. SCOTT
                                UNITED STATES MAGISTRATE JUDGE

DATED: May 26, 2015